EXHIBIT A

Case 8:23-cv-01890-KKM-TGW   Document 1-1   Filed 08/21/23   Page 2 of 58 PageID 27

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT

IN AND FOR THE HILLSBOROUGH COUNTY, FLORIDA

CIVIL DIVISION

| | |
|---|---|
| DAVID RAMIREZ, individually and on behalf of all others similarly situated,<br><br>                        Plaintiff,<br><br>v.<br><br>FLORIDA HEALTH SCIENCES CENTER, INC. d/b/a TAMPA GENERAL HOSPITAL,<br><br>                        Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff David Ramirez ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned attorneys, brings this class action against Defendant Florida Health Sciences Center, Inc. d/b/a Tampa General Hospital ("TGH" or "Defendant") and alleges upon personal knowledge as to himself and upon information and belief as to all other matters.

### INTRODUCTION

1.      Plaintiff brings this class action against TGH for its failure to secure and safeguard the personally identifiable information ("PII") and personal health information ("PHI") (collectively, "Personal Information") of approximately 1.2 million TGH patients.

2.      Defendant TGH is a private not-for-profit hospital based in West Central Florida. In the ordinary course of doing business with TGH, TGH's patients are required to provide and entrust TGH with sensitive and Personal Information, including PII and PHI.

3.      TGH reports that, on or around May 31, 2023, TGH detected unusual activity on its computer systems.[1] TGH published a "Cybersecurity Notice" on its website, which reveals that "an unauthorized third party accessed TGH's network and obtained certain files from its systems between May 12 and May 30, 2023" (the "Data Breach").[2]

4.      TGH admitted that the impacted files contained sensitive Personal Information, including "names, addresses, phone numbers, dates of birth, Social Security numbers, health insurance information, medical record numbers, patient account numbers, dates of service and/or limited treatment information used by TGH for its business operations."[3]

5.      TGH provides scant detail about the Data Breach and the steps that TGH is taking to address it. It merely stated that it "is continuously updating and hardening systems to help prevent events such as [the Data Breach] from occurring and has implemented additional defensive tools and increased monitoring."[4]

6.      TGH stated that it "will be mailing notification letters to individuals whose information may have been involved in this event and is also providing individuals whose Social Security number was involved with complimentary credit monitoring and identity theft protection services."[5] Approximately 1.2 million individuals were reportedly impacted by the Data Breach.[6]

---

[1] *Cybersecurity Notice*, TAMPA GENERAL HOSPITAL, https://www.tgh.org/cybersecurity-notice (last accessed July 21, 2023).
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] Christopher O'Donnell, *Tampa General reports confidential data of 1.2 million patients hacked*, TAMPA BAY TIMES (2023), https://www.tampabay.com/news/health/2023/07/19/tampa-general-reports-confidential-data-12-million-patients-hacked/ (last accessed July 21, 2023).

7.      Despite learning of the Data Breach as early as May 2023, TGH did not announce the Data Breach publicly until on or around July 20, 2023 and did not begin sending out Data Breach notification letters to affected individuals until around that time.

8.      TGH's notice did not disclose how it discovered the encrypted files on its computer systems were impacted, the means and mechanism of the cyberattack, the reason for the delay in notifying Plaintiff and the class of the Data Breach, how TGH determined that the PII/PHI had been "accessed" by an unauthorized party, and, importantly, what steps TGH took following the Data Breach to secure its systems and prevent future cyberattacks.

9.      The Data Breach was a direct result of TGH's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect Personal Information from the foreseeable threat of a cyberattack.

10.      By being entrusted with Plaintiff's and class members' Personal Information for its own pecuniary benefit, TGH assumed a duty to Plaintiff and class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and class members' Personal Information against unauthorized access and disclosure. TGH also had a duty to adequately safeguard this Personal Information under controlling Florida case law, as well as pursuant to industry standards and duties imposed by statutes, including HIPAA regulations and Section 5 of the Federal Trade Commission Act ("FTC Act"). TGH breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect the Personal Information in its possession from unauthorized access and disclosure.

11.      As a result of TGH's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff and approximately 1.2 million class members suffered

injury and ascertainable losses in the form of out-of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigate the effects of the attack, the diminution in value of their personal information from its exposure, and the present and imminent thread of fraud and identity theft. This action seeks to remedy these failings and their consequences.

12.     The injury to Plaintiff and class members was compounded by the fact that TGH did not notify those affected that their Personal Information was subject to unauthorized access and exfiltration until July 2023, nearly two months after the Data Breach was discovered. TGH's failure to timely notify the victims of its Data Breach meant that Plaintiff and class members were unable to immediately take affirmative measures to prevent or mitigate the resulting harm.

13.     Despite having been accessed and exfiltrated by unauthorized criminal actors, Plaintiff's and class members' sensitive and confidential Personal Information remain in the possession of TGH. Absent additional safeguards and independent review and oversight, the information remains vulnerable to further cyberattacks and theft.

14.     TGH disregarded the rights of Plaintiff and class members by, *inter alia*, failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard patient Personal Information; failing to take standard and reasonably available steps to prevent the Data Breach; failing to properly train its staff and employees on proper security measures; and failing to provide Plaintiff and class members prompt and adequate notice of the Data Breach.

15.     In addition, TGH failed to properly monitor the computer network and systems that housed the Personal Information. Had TGH properly monitored these electronic systems, it would have discovered the intrusion sooner or prevented it altogether.

16.     The security of Plaintiff's and class members' identities is now at risk because of TGH's wrongful conduct as the Personal Information that TGH collected and maintained is now in the hands of data thieves. This present risk will continue for the course of their lives.

17.     Armed with the Personal Information accessed in the Data Breach, data thieves can commit a wide range of crimes including, for example, opening new financial accounts in class members' names, taking out loans in their names, using class members' identities to obtain government benefits, filing fraudulent tax returns using their information, obtaining driver's licenses in class members' names, and giving false information to police during an arrest.

18.     As a result of the Data Breach, Plaintiff and class members have been exposed to a present and imminent risk of fraud and identity theft. Among other measures, Plaintiff and class members must now and in the future closely monitor their financial accounts and medical records to guard against identity theft. Further, Plaintiff and class members will incur out-of-pocket costs to purchase credit monitoring and identity theft protection and insurance services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

19.     Plaintiff and class members will also be forced to expend additional time to review credit reports and monitor their financial accounts and medical records for fraud or identity theft. And because the exposed information includes Social Security numbers and other immutable personal details, the risk of identity theft and fraud will persist throughout their lives.

20.     Plaintiff brings this action on behalf of himself and individuals in the United States whose Personal Information was exposed as a result of the Data Breach, which TGH learned of on or about May 31, 2023 and first publicly acknowledged on or about July 20, 2023. Plaintiff and class members seek to hold TGH responsible for the harms resulting from the massive and preventable disclosure of such sensitive and personal information. Plaintiff seeks to remedy the

harms resulting from the Data Breach on behalf of himself and all similarly situated individuals whose Personal Information was accessed and exfiltrated during the Data Breach.

21.     Plaintiff, on behalf of himself and all other class members, brings claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, unjust enrichment, violations of the Florida consumer protection law, and for declaratory and injunctive relief. To remedy these violations of law, Plaintiff and class members thus seek actual damages, statutory damages, restitution, and injunctive and declaratory relief (including significant improvements to TGH's data security protocols and employee training practices), reasonable attorneys' fees, costs, and expenses incurred in bringing this action, and all other remedies this Court deems just and proper.

## PARTIES

### Plaintiff

22.     Plaintiff David Ramirez is a citizen of Florida and resides in Tampa, Florida. Plaintiff has been a patient at TGH in recent years, and Plaintiff provided his PII/PHI to TGH, or otherwise had his PII/PHI provided to TGH, in connection with receiving health care services from it. In receiving and maintaining his Personal Information for its business purposes, TGH expressly and impliedly promised, and undertook a duty, to act reasonably in its handling of Plaintiff's Personal Information. TGH, however, did not take proper care of Plaintiff's Personal Information, leading to its exposure to and exfiltration by cybercriminals as a direct result of TGH's inadequate security measures.

23.     Plaintiff has suffered harm as a result of the Data Breach. To date, Plaintiff has spent several hours checking his credit and financial accounts for any unauthorized activity, a practice Plaintiff will need to continue indefinitely to protect against and fraud and identity theft.

24.     Plaintiff recently has experienced attempted fraud, including attempts to make purchases through his Ashley Furniture account, and hackers accessed his Equifax account gaining access to his sensitive information.

25.     Plaintiff also suffered actual injury from having his Personal Information compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of his confidential personal information—a form of property that Plaintiff entrusted to TGH, which was compromised as a result of the Data Breach it failed to prevent and (b) a violation of his privacy rights as a result of TGH's unauthorized disclosure of his Personal Information.

26.     Had Plaintiff known that TGH does not adequately protect PII/PHI, she would not have agreed to provide TGH with his PII/PHI, or agreed to have his PII/PHI provided to TGH.

27.     As a result of TGH's failure to adequately safeguard Plaintiff's information, she has been injured. Plaintiff is also at a continued risk of harm because his information remains in TGH's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as TGH fails to undertake the necessary and appropriate data security measures to protect the PII and PHI in its possession.

**Defendant**

28.     Defendant Florida Health Sciences Center, Inc. d/b/a Tampa General Hospital is a Florida-based healthcare provider with its principal place of business is located at One Tampa General Circle, Tampa, Florida 33606.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action under Florida Stat. § 26.012 and § 86.011. This Court has jurisdiction over this dispute because Plaintiff seeks on

behalf of himself and the class damages in excess of the minimum jurisdictional limits of this Court, as well as equitable relief.

30.      Venue is proper in this County pursuant to Florida Stat. § 47.011 and § 47.051 because TGH is headquartered and does business in this County, the cause of action accrued in this County, and TGH has an office for the transaction of its customary business in this county.

31.      This Court has personal jurisdiction over TGH pursuant to Fla. Stat. § 48.193 because TGH operated, conducted, engaged in, or carried on a business or business venture in Florida and/or had offices in Florida, committed tortious acts in Florida, and engaged in significant business activities within Florida.

## FACTUAL ALLEGATIONS

**A.      Overview of Tampa General Hospital**

32.      Tampa General Hospital is a private not-for-profit hospital based in West Central Florida.[7] TGH serves "a dozen counties with a population in excess of 4 million" and, "[a]s one of the largest hospitals in Florida, Tampa General is licensed for 1,040 beds, and with more than 8,000 team members, is one of the region's largest employers."[8]

33.      In the regular course of its business, TGH collects and maintains the PII/PHI of patients and other persons in relation to providing healthcare or other services.

34.      As a regular part of its business, TGH requires patients and other individuals to provide Personal Information before it provides services. That information includes, *inter alia*, demographic information such as names, addresses, phone numbers, dates of birth, Social Security

---

[7] *Shared Purpose And Vision*: TAMPA GENERAL HOSPITAL,  https://www.tgh.org/about-tgh (last accessed July 21, 2023).
[8] *Id.*

numbers, health insurance information, medical record numbers, patient account numbers, dates of service and/or limited treatment information used by TGH for its business operations. TGH stores this information digitally.

35.    As a HIPAA covered business entity (*see infra*), TGH is required to implement adequate safeguards to prevent unauthorized use or disclosure of Personal Information, including by implementing requirements of the HIPAA Security Rule[9] and to report any unauthorized use or disclosure of Personal Information, including incidents that constitute breaches of unsecured protected health information as in the case of the Data Breach complained of herein.

36.    In the "Joint Notice of Privacy Practices And Notice of Organized Health Care Arrangement," available on its website, TGH states[10]:

### Our Pledge Regarding Health Information

We understand that health information about you and your health is personal. We are committed to protecting health information about you. We create a record of the care and services you receive. We need this record to provide you with quality care and to comply with certain legal requirements. This notice applies to all the records of your care, whether made by personnel or treating physicians, whether in paper, electronic or other forms of media. Your treating physicians outside of the OHCA may have different policies or notices regarding the use and disclosure of your health information created in the doctor's office or clinic. This notice will tell you about the ways in which we may use and disclose health information about you. We also will describe your rights and certain obligations we have regarding the use and disclosure of health information.

We are required by law to:

---

[9] The HIPAA Security Rule establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity. The Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information. *See* 45 C.F.R. Part 160 and Part 164, Subparts A and C.

[10] *Joint Notice of Privacy Practices And Notice of Organized Health Care Arrangement*, TAMPA GENERAL HOSPITAL, available at https://mychart.tgh.org/MyChart//EN-US/Docs/TGH_Privacy.pdf (last accessed July 21, 2023).

• Make sure that health information that identifies you is kept private
• Give you this notice of our legal duties and privacy practices with respect to health information about you
• Follow the terms of the notice that are currently in effect
• Notify you in the event of a breach of privacy regarding your private health information

37.    Yet, TGH waited approximately two months after discovering the Data Breach to notify those affected that their PII/PHI had been compromised.

38.    Plaintiff and class members are, or were, patients of TGH or received healthcare or other services from TGH, or otherwise are affiliated or transacted with TGH, and entrusted TGH with their PII/PHI.

**B.    TGH Is a HIPAA Covered Business Associate**

39.    TGH is a HIPAA covered business associate that provides healthcare services throughout West Central Florida.

40.    As a regular and necessary part of its business TGH collects and custodies the highly sensitive Personal Information of its patients and other individuals in relation providing health-related or other services. TGH is required under federal and state law to maintain the strictest confidentiality of the Personal Information that it requires, receives, and collects, and TGH is further required to maintain sufficient safeguards to protect that Personal Information from being accessed by unauthorized third parties.

41.    As a HIPAA covered business entity, TGH is required to implement adequate safeguards to prevent unauthorized use or disclosure of Personal Information it is entrusted, including by implementing requirements of the HIPAA Security Rule[11] and to report any

---

[11] The HIPAA Security Rule establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity. The Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information. *See* 45 C.F.R. Part 160 and Part 164, Subparts A and C.

unauthorized use or disclosure of Personal Information, including incidents that constitute breaches of unsecured protected health information as in the case of the Data Breach complained of herein.

42.     As a condition of receiving TGH's services or otherwise transacting business with TGH, TGH requires that patients (including Plaintiff and class members) and other individuals who are affiliated or transacted with TGH, entrust it with highly sensitive Personal Information. Due to the nature of TGH's business of providing healthcare services, TGH would be unable to engage in its regular business activities without collecting and aggregating Personal Information that it knows and understands to be sensitive and confidential.

43.     Plaintiff's and class members' medical records were maintained by TGH and directly or indirectly entrusted TGH with their Personal Information. Plaintiff and class members reasonably expected that TGH would safeguard their highly sensitive information and keep their Personal Information confidential.

## C.      The Data Breach Compromised Plaintiff's and Class Members' PII/PHI

44.     On or about May 31, 2023, according to the notice TGH posted to its website, TGH detected unusual activity on its systems. The notice stated that "TGH's monitoring systems and experienced technology professionals effectively prevented encryption, which would have significantly interrupted the hospital's ability to provide care for patients. However, the investigation determined that an unauthorized third party accessed TGH's network and obtained certain files from its systems between May 12 and May 30, 2023."[12]

45.     TGH did not publicly announce the Data Breach until on or around July 2023. TGH admitted that the unauthorized party accessed files within its system that included sensitive

---

[12] *Cybersecurity Notice*, TAMPA GENERAL HOSPITAL, https://www.tgh.org/cybersecurity-notice (last accessed July 21, 2023).

Personal Information, including "names, addresses, phone numbers, dates of birth, Social Security numbers, health insurance information, medical record numbers, patient account numbers, dates of service and/or limited treatment information used by TGH for its business operations."[13]

46.    TGH's notice vaguely describes the measures it took following its discovery of the Data Breach, stating only that it "immediately took steps to contain the activity and began an investigation with the assistance of a third-party forensic firm" and that it "reported the event to the FBI and provided information to support its investigation of the criminal group responsible."[14]

47.    TGH's notice omits pertinent information including how criminals gained access to the encrypted files on its systems, what computer systems were impacted, the means and mechanisms of the cyberattack, the reason for the delay in notifying Plaintiff and class members of the Data Breach, how it determined that the Personal Information had been accessed, and of particular importance to Plaintiff and class members, what *actual* steps TGH took following the Data Breach to secure its systems and train its employees to prevent further cyberattacks.

48.    Based on TGH's acknowledgment that "an unauthorized party accessed TGH's network and obtained certain files from its systems", it is evident that unauthorized criminal actors did in fact access TGH's network and exfiltrate Plaintiff's and class members' Personal Information in an attack designed to acquire that sensitive, confidential, and valuable information, despite TGH's statement that "electronic medical record system was **not** involved or accessed."[15]

49.    The Personal Information contained in the files accessed by cybercriminals appears not to have been encrypted because if properly encrypted, the attackers would have acquired

---

[13] *Id.*
[14] *Id.*
[15] *Id.*

unintelligible data and would not have "accessed" Plaintiff's and class members' Personal Information.

50.    THG did not confirm whether some or all of its locations were impacted by the Data Breach. The Data Breach reportedly impacted the protected health information of approximately 1.2 million individuals.[16]

51.    As a HIPAA associated business entity that collects, creates, and maintains significant volumes of Personal Information, the targeted attack was a foreseeable risk of which TGH was aware and knew it had a duty to guard against.

52.    The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Personal Information of TGH patients, and other individuals who are affiliated or transacted with TGH.

53.    Despite detecting the Data Breach on or around May 31, 2023, TGH waited approximately two months to notify the impacted individuals of the Data Breach and of the need for them to protect themselves against fraud and identity theft. TGH was, of course, too late in the discovery and notification of the Data Breach.

54.    Due to TGH's inadequate security measures and its delayed notice to victims, Plaintiff and class members now face a present, immediate, and ongoing risk of fraud and identity theft and must deal with that threat forever.

55.    TGH had obligations created by HIPAA, contract, industry standards and common law made to Plaintiff and class members to keep their Personal Information confidential and to protect it from unauthorized access and disclosure.

---

[16] Christopher O'Donnell, *Tampa General reports confidential data of 1.2 million patients hacked*, TAMPA BAY TIMES (2023), https://www.tampabay.com/news/health/2023/07/19/tampa-general-reports-confidential-data-12-million-patients-hacked/ (last accessed July 21, 2023).

56.     Plaintiff and class members entrusted their Personal Information to TGH with the reasonable expectation and mutual understanding that TGH or anyone who used their Personal Information in conjunction with the healthcare services they received would comply with obligations to keep such information confidential and secure from unauthorized access after it received such information.

57.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and class members' Personal Information, TGH assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and class members' Personal Information from unauthorized disclosure.

58.     Plaintiff and the class members have taken reasonable steps to maintain the confidentiality of their personal information. Plaintiff and class members would not have allowed TGH or anyone in TGH's position to receive their PII/PHI had they known that TGH would fail to implement industry standard protections for that sensitive information.

59.     As a result of TGH's negligent and wrongful conduct, Plaintiff's and class members' highly confidential and sensitive Personal Information was left exposed to cybercriminals.

**D.     Defendant Was Obligated Under HIPAA to Safeguard the Personal Information**

60.     TGH is a covered business associate under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

61.     TGH is subject to the rules and regulations for safeguarding electronic forms of

medical information pursuant to the Health Information Technology Act ("HITECH").[17] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

62.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

63.     HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

64.     HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

65.     "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

66.     HIPAA's Security Rule requires TGH to do the following:

    a.  Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

    b.  Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

    c.  Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

    d.  Ensure compliance by its workforce.

---

[17] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information.  HITECH references and incorporates HIPAA.

67.     HIPAA also requires TGH to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, TGH is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

68.     HIPAA and HITECH also obligated TGH to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

69.     The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires TGH to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[18]

70.     HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

71.     HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

---

[18]    *Breach Notification Rule*, U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last accessed on Nov. 8, 2022) (emphasis added).

72.     HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[19] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[20]

**E.      TGH Failed to Follow FTC Guidelines**

73.     TGH was also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

74.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

---

[19] *Security Rule Guidance Material*, U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last accessed on Nov. 15, 2022).
[20] *Guidance on Risk Analysis*, U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last accessed on Nov. 15, 2022).

75.     According to the FTC, the need for data security should be factored into all business decision-making.

76.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.

77.     The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

78.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

79.     The FTC further recommends that companies not maintain Personal Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

80.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

81.     TGH failed to properly implement basic data security practices.

82.     TGH's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' and other individuals' Personal Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

83.     TGH was at all times fully aware of its obligation to protect the Personal Information of the patients and other individuals of whom entrusted TGH with their Personal Information. TGH was also aware of the significant repercussions that would result from its failure to do so.

**F.     TGH Failed to Comply with Industry Standards For Data Security**

84.     As described above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

85.     Several best practices have been identified that at a minimum should be implemented by HIPAA covered business entities like TGH, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

86.     Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

87.     TGH failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

88.     These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and TGH failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

**G.     TGH Owed Plaintiff and Class Members a Duty to Safeguard Their Personal Information**

89.     In addition to its obligations under federal and state laws, TGH owed a duty to Plaintiff and class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Personal Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. TGH owed a duty to Plaintiff and class members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Personal Information of class members.

90.     TGH owed a duty to Plaintiff and class members to create and implement reasonable data security practices and procedures to protect the Personal Information in its possession, including adequately training its employees and others who accessed Personal Information within its computer systems on how to adequately protect Personal Information.

91.     TGH owed a duty to Plaintiff and class members to implement processes that would detect a compromise of Personal Information in a timely manner.

92.     TGH owed a duty to Plaintiff and class members to act upon data security warnings and alerts in a timely fashion.

93.     TGH owed a duty to Plaintiff and class members to disclose in a timely and accurate manner when and how the Data Breach occurred.

94.     TGH owed a duty of care to Plaintiff and class members because they were foreseeable and probable victims of any inadequate data security practices.

**H.     TGH Knew That Criminals Target PII/PHI**

95.     THG's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry and other industries holding significant amounts of PII and PHI preceding the date of the breach.

96.     At all relevant times, TGH knew, or should have known, its patients', Plaintiff's, and all other class members' PII/PHI was a target for malicious actors. Despite such knowledge, TGH failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and class members' Personal Information from cyber-attacks that TGH should have anticipated and guarded against.

97.     The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Personal Information of patients and/or plan members, like Plaintiff and class members.

98.     Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Proetus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the

2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[21]

99.      The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than 5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[22]

100.     Further, a 2022 report released by IBM Security states that for 12 consecutive years the healthcare industry has had the highest average cost of a data breach and as of 2022 healthcare data breach costs have hit a new record high.[23]

101.     Personal Information is a valuable property right.[24] The value of Personal Information as a commodity is measurable.[25] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[26] American companies are estimated to have spent

---

[21] *2022 Breach Barometer*, Protenus (2022), https://www.protenus.com/breach-barometer-report.

[22] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

[23] *Cost of a Data Breach Report 2022*, IBM Security (July 2022), https://www.ibm.com/downloads/cas/3R8N1DZJ.

[24] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP Advances in Information and Communication Technology (May 2015), https://www.researchgate.net/publication/283668023 ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible...").

[25] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, Medscape (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

[26] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220, OECD Publishing (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

over \$19 billion on acquiring personal data of consumers in 2018.[27] It is so valuable to identity thieves that once Personal Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

102. As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, Personal Information, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

103. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[28] A cybercriminal who steals a person's PHI can end up with as many as "seven to 10 personal identifying characteristics of an individual."[29] A study by Experian found that the "average total cost" of medical identity theft is "about \$20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[30]

---

[27] *U.S. Firms to Spend Nearly \$19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, Interactive Advertising Bureau (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[28] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech Magazine (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[29] *Id.*

[30] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.

104.    Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[31] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[32] All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[33] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[34] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[35]

105.    Criminals can use stolen Personal Information to extort a financial payment by "leveraging details specific to a disease or terminal illness."[36] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[37]

---

[31] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[32] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web,* Experian (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[33] Adam Greenberg, *Health insurance credentials fetch high prices in the online black market*, SC Magazine (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[34] *In the Dark*, VPNOverview.com, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed on Nov. 14, 2022).

[35] *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI Cyber Division (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[36] *See* n.19, *supra*.

[37] *Id.*

106.    Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[38]

107.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Personal Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

108.    Indeed, cyberattacks against the healthcare industry have been common for over ten years with the Federal Bureau of Investigation ("FBI") warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[39]

109.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals… because they often have lesser IT defenses and a high incentive to regain access to their data quickly.[40]

---

[38] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) Information Systems Research 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.
[39] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.
[40] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

110.    In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[41]

111.    TGH was on notice that the FBI has recently been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[42]

112.    The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[43]

113.    As implied by the above AMA quote, stolen Personal Information can be used to interrupt important medical services. This is an imminent and certainly impending risk for Plaintiff and class members.

114.    TGH was on notice that the federal government has been concerned about healthcare company data encryption practices. TGH knew its employees accessed and utilized

---

[41] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack,* Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

[42] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[43] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, American Medical Association (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

protected health information in the regular course of their duties, yet it appears that information was not encrypted.

115.    The Office for Civil Rights ("OCR") urges the use of encryption of data containing sensitive personal information. As long ago as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, OCR's deputy director of health information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[44]

116.    As a HIPAA covered business associate, TGH should have known about its data security vulnerabilities and implemented enhanced and adequate protection, particularly given the nature of the Personal Information stored in its unprotected files.

## I.    Theft of PII/PHI Has Grave and Lasting Consequences for Victims

117.    Theft of PII/PHI is serious. The Federal Trade Commission ("FTC") warns consumers that identity thieves use PII/PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[45]

118.    Identity thieves use Personal Information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[46] According to Experian, one of the

---

[44] *Stolen Laptops Lead to Important HIPAA Settlements*, U.S. Department of Health and Human Services (Apr. 22, 2014), https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

[45] *See What to Know About Identity Theft*, Federal Trade Commission Consumer Advice, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed on Nov. 15, 2022).

[46] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or

largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.[47]

119.    With access to an individual's Personal Information, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture, using the victim's name and SSN to obtain government benefits, or filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[48]

120.    Each year, identity theft causes billions of dollars of losses to victims in the United States.  For example, with the Personal Information stolen in the Data Breach, which includes Social Security numbers, identity thieves can open financial accounts, commit medical fraud, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal

---

[47] Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, Experian (Sept. 1, 2017), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[48] *See Warning Signs of Identity Theft*, Federal Trade Commission, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited Nov. 15, 2022).

government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.   These criminal activities have and will result in devastating financial and personal losses to Plaintiff and class members.

121.    Personal Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on dark web black-markets for years.

122.    For example, it is believed that certain highly sensitive personal information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related unemployment benefits.

123.    The Personal Information exposed in this Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein. These risks are both certainly impending and substantial. As the FTC has reported, if cyber thieves get access to a person's highly sensitive information, they will use it.[49]

124.    Cyber criminals may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[50]

---

[49] Ari Lazarus, *How fast will identity thieves use stolen info?*, Federal Trade Commission (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

[50] *Report to Congressional Requesters: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, United States Government Accountability Office, https://www.gao.gov/assets/gao-07-737.pdf.

125.   For instance, with a stolen Social Security number, which is only one subset of the Personal Information compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[51]

126.   Identity thieves can use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

127.   This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

128.   Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[52]

129.   Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach

---

[51] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number* (Nov. 2, 2017), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[52] *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces*, Identity Theft Resource Center (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/.

victim has to demonstrate ongoing harm from misuse of his SSN, and a new SSN will not be provided until after the victim has suffered the harm.

130.    Due to the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[53]

131.    Theft of PII is even more serious when it includes theft of PHI. Medical identity theft is one of the most common, most expensive, and most difficult-to-prevent forms of identity theft. According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013," which is more than identity thefts involving banking and finance, the government and the military, or education.[54] "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[55]

132.    Data breaches involving medical information "typically leave[] a trail of falsified

---

[53] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[54] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/.
[55] *Id.*

information in medical records that can plague victims' medical and financial lives for years."[56] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[57] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use Personal Information "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [58] The FTC also warns, "If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use. It could also hurt your credit."[59]

133.    A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought nor received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

---

[56] Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, World Privacy Forum (Dec. 12, 2017), https://www.worldprivacyforum.org/2017/12/new-report-the-geography-of-medical-identity-theft/.
[57] *See* n.26, *supra*.
[58] *See* n.36, *supra*.
[59] *Id.*

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[60]

134. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

135. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[61]

136. It is within this context that Plaintiff and all other class members must now live with the knowledge that their Personal Information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

137. A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:

---

[60] *See* n.47, *supra*.
[61] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.



138.    Victims of the Data Breach, like Plaintiff and class members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.[62]

139.    As a direct and proximate result of the Data Breach, Plaintiff and class members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.  Plaintiff and class members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions and healthcare providers, closing or modifying financial accounts, and closely

---

[62] *Guide for Assisting Identity Theft Victims*, Federal Trade Commission, 4 (Sept. 2013), http://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

140.    Plaintiff and class members have suffered or will suffer actual harms for which they are entitled to compensation, including but not limited to the following:

a.  Trespass, damage to, and theft of their personal property, including Personal Information;

b.  Improper disclosure of their Personal Information;

c.  The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their Personal Information being in the hands of criminals and having already been misused;

d.  The imminent and certainly impending risk of having their confidential medical information used against them by spam callers to defraud them;

e.  Damages flowing from Defendant's untimely and inadequate notification of the Data Breach;

f.  Loss of privacy suffered as a result of the Data Breach;

g.  Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the data breach;

h.  Ascertainable losses in the form of deprivation of the value of patients' personal information for which there is a well-established and quantifiable national and international market;

i.  The loss of use of and access to their credit, accounts, and/or funds;

j.  Damage to their credit due to fraudulent use of their Personal Information; and

k. Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

141. Moreover, Plaintiff and class members have an interest in ensuring that their Personal Information, which remains in the possession of Defendant, is protected from further public disclosure by the implementation of better employee training and industry standard and statutorily compliant security measures and safeguards. Defendant has shown itself to be wholly incapable of protecting Plaintiff's and class members' Personal Information.

142. Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries. For this reason, Defendant knew or should have known about these dangers and strengthened its data security accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

**J.     The Data Breach Was Foreseeable and Preventable**

143. Data disclosures and data breaches are preventable.[63] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[64] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[65]

144. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information

---

[63] Lucy L. Thompson, *Despite the Alarming Trends, Data Breaches Are Preventable*,  Data Breach and Encryption Handbook (Lucy Thompson, ed., 2012).
[64] *Id.* at 17.
[65] *Id.* at 28.

security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[66]

145.   As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[67]

146.   Plaintiff and class members entrusted their Personal Information to TGH as a condition of receiving healthcare related services. Plaintiff and class members understood and expected that TGH or anyone in TGH's position would safeguard their Personal Information against cyberattacks, delete or destroy Personal Information that TGH was no longer required to maintain, and timely and accurately notify them if their Personal Information was compromised.

**K.      Plaintiff's and Class Members' Damages**

147.   To date, TGH has done nothing to provide Plaintiff and class members with relief for the damages they have suffered as a result of the Data Breach. TGH only offered credit monitoring and identity theft protection services to those "individuals whose Social Security number was involved" but did not disclose how it determined eligibility. Not only did TGH fail to provide any ongoing credit monitoring or identity protection services for *all* individuals impacted by the Data Breach, but the credit monitoring identity theft protection services does nothing to compensate class members for damages incurred and time spent dealing with the Data Breach.

148.   Plaintiff and class members have been damaged by the compromise of their Personal Information in the Data Breach.

149.   As a direct and proximate result of TGH's conduct, Plaintiff and class members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud

---

[66] *Id.*

[67] *See How to Protect Your Networks from RANSOMWARE*, at 3, FBI.gov, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed Nov. 14, 2022).

and identity theft. Plaintiff and class members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

150.    Plaintiff and class members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Personal Information as potential fraudsters could use that information to target such schemes more effectively to Plaintiff and class members.

151.    Plaintiff and class members have and will also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

152.    Plaintiff and class members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.  Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b.  Purchasing credit monitoring and identity theft prevention;

c.  Placing "freezes" and "alerts" with reporting agencies;

d.  Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e.  Contacting financial institutions and closing or modifying financial accounts; and

      f.   Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

153.    Plaintiff and class members suffered actual injury from having their Personal Information compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of their Personal Information, a form of property that TGH obtained from Plaintiff and class members; (b) violation of their privacy rights; (c) imminent and impending injury arising from the increased risk of identity theft and fraud; and (d) emotional distress.

154.    Further, as a result of Defendant's conduct, Plaintiff and class members are forced to live with the anxiety that their Personal Information may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy with respect to that information.

155.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff and class members have suffered a loss of privacy and are at a present and imminent and increased risk of future harm.

156.    Moreover, Plaintiff and class members have an interest in ensuring that their Personal Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Personal Information is not accessible online, is properly encrypted, and that access to such data is password protected.

157.    Many failures laid the groundwork for the occurrence of the Data Breach, starting with Defendant's failure to incur the costs necessary to implement adequate and reasonable cyber

security training, procedures and protocols that were necessary to protect Plaintiff's and class members' Personal Information.

158.    Defendant maintained the Personal Information in an objectively reckless manner, making the Personal Information vulnerable to unauthorized disclosure.

159.    Defendant knew, or reasonably should have known, of the importance of safeguarding Personal Information and of the foreseeable consequences that would result if Plaintiff's and class members' Personal Information was stolen, including the significant costs that would be placed on Plaintiff and class members as a result of the breach.

160.    The risk of improper disclosure of Plaintiff's and class members' Personal Information was a known risk to Defendant, and thus Defendant was on notice that failing to take necessary steps to secure Plaintiff's and class members' Personal Information from that risk left the Personal Information in a dangerous condition.

161.    Defendant disregarded the rights of Plaintiff and class members by, *inter alia*, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that the Personal Information was protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiff's and class members' Personal Information; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiff and class members prompt and accurate notice of the Data Breach.

## CLASS ALLEGATIONS

162.    Plaintiff brings this class action on behalf of himself and all members of the following Classes of similarly situated persons pursuant to Florida Rule of Civil Procedure 1.220.

Plaintiff seeks certification of a Class defined as follows:

**Nationwide Class**

All persons residing in the United States whose Personal Information was compromised in the Data Breach disclosed by TGH on or about July 20, 2023, including all who were sent notice of the Data Breach.

163.    In the alternative, Plaintiff seeks certification of the following class:

**Florida Class**

All persons residing in the state of Florida whose Personal Information was compromised in the Data Breach disclosed by TGH on or about July 20, 2023, including all who were sent notice of the Data Breach.

164.    Excluded from the class is TGH and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

165.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

166.    _Numerosity:_ The members in the class are so numerous that joinder of all class members in a single proceeding would be impracticable. As noted above, TGH reported that approximately 1.2 million individuals' information was exposed in the Data Breach.

167.    _Commonality and Predominance:_ Common questions of law and fact exist as to all class members and predominate over any potential questions affecting only individual class members. Such common questions of law or fact include, _inter alia_:

      a.   Whether TGH had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and class members' PII/PHI from unauthorized access and disclosure;

b.  Whether TGH's computer systems and data security practices used to protect Plaintiff's and class members' Personal Information violated the FTC Act and/or HIPAA, and/or state laws and/or TGH's other duties discussed herein;

c.  Whether TGH failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and class members;

d.  Whether Plaintiff and class members suffered injury as a proximate result of TGH's negligent actions or failures to act;

e.  Whether TGH failed to exercise reasonable care to secure and safeguard Plaintiff's and class members' Personal Information;

f.  Whether an implied contract existed between class members and TGH providing that TGH would implement and maintain reasonable security measures to protect and secure class members' Personal Information from unauthorized access and disclosure;

g.  Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiff and class members;

h.  Whether TGH's actions and inactions alleged herein constitute gross negligence;

i.  Whether TGH breached its duties to protect Plaintiff's and class members' Personal Information; and

      j.    Whether Plaintiff and all other members of the class are entitled to damages and

           the measure of such damages and relief.

168.    TGH engaged in a common course of conduct giving rise to the legal rights sought

to be enforced by Plaintiff on behalf of himself and all other class members. Individual questions,

if any, pale in comparison, in both quantity and quality, to the numerous common questions that

dominate this action.

169.    <u>Typicality:</u> Plaintiff's claims are typical of the claims of the class. Plaintiff, like all

proposed members of the class, had his Personal Information compromised in the Data Breach.

Plaintiff and class members were injured by the same wrongful acts, practices, and omissions

committed by TGH, as described herein. Plaintiff's claims therefore arise from the same practices

or course of conduct that give rise to the claims of all class members.

170.    <u>Adequacy:</u> Plaintiff will fairly and adequately protect the interests of the class

members. Plaintiff is an adequate representative of the class and has no interests adverse to, or

conflict with, the class she seeks to represent. Plaintiff has retained counsel with substantial

experience and success in the prosecution of complex consumer protection class actions of this

nature.

171.    A class action is superior to any other available means for the fair and efficient

adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action. The damages and other financial detriment suffered by Plaintiff

and all other class members are relatively small compared to the burden and expense that would

be required to individually litigate their claims against TGH, so it would be impracticable for class

members to individually seek redress from TGH's wrongful conduct. Even if class members could

afford individual litigation, the court system could not. Individualized litigation creates a potential

for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
## NEGLIGENCE

172.    Plaintiff realleges and incorporates by reference paragraphs 1 through 171 above as if fully set forth herein.

173.    TGH owed a duty to Plaintiff and all other class members to exercise reasonable care in safeguarding and protecting their PII/PHI in its possession, custody, or control.

174.    TGH knew, or should have known, the risks of collecting and storing Plaintiff's and all other class members' Personal Information and the importance of maintaining secure systems. TGH knew, or should have known, of the many data breaches that targeted healthcare providers in recent years.

175.    Given the nature of TGH's business, the sensitivity and value of the Personal Information it maintains, and the resources at its disposal, TGH should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

176.    TGH breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and class members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Personal Information entrusted to it—including Plaintiff's and class members' Personal Information.

177.     It was reasonably foreseeable to TGH that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and class members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and class members' Personal Information to unauthorized individuals.

178.     But for TGH's negligent conduct or breach of the above-described duties owed to Plaintiff and class members, their Personal Information would not have been compromised.

179.     As a result of TGH's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) actual or attempted fraud.

## COUNT II
## NEGLIGENCE PER SE

180.     Plaintiff realleges and incorporates by reference paragraphs 1 through 171 above as if fully set forth herein.

181.     TGH's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164,

Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

182.    TGH's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as TGH, of failing to employ reasonable measures to protect and secure Personal Information.

183.    TGH's duties further arise from the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1302(d), *et seq.*

184.    TGH is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

185.    TGH violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other class members' Personal Information and not complying with applicable industry standards. TGH's conduct was particularly unreasonable given the nature and amount of Personal Information it obtains and stores, and the foreseeable consequences of a data breach involving Personal Information including, specifically, the substantial damages that would result to Plaintiff and the other class members.

186.    TGH's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

187.    Plaintiff and class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

188.    The harm occurring as a result of the Data Breach is the type of harm HIPAA

Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

189.    It was reasonably foreseeable to TGH that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and class members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and class members' Personal Information to unauthorized individuals.

190.    The injury and harm that Plaintiff and the other class members suffered was the direct and proximate result of TGH's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Personal Information; (iii) breach of the confidentiality of their Personal Information; (iv) deprivation of the value of their Personal Information, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) actual or attempted fraud.

## COUNT III
## BREACH OF FIDUCIARY DUTY

191.    Plaintiff realleges and incorporates by reference paragraphs 1 through 171 above as if fully set forth herein.

192.    Plaintiff and class members either directly or indirectly gave TGH their Personal Information in confidence, believing that TGH would protect that information. Plaintiff and class

members would not have provided TGH with this information had they known it would not be adequately protected. TGH's acceptance and storage of Plaintiff's and class members' Personal Information created a fiduciary relationship between TGH and Plaintiff and class members. In light of this relationship, TGH must act primarily for the benefit of its patients and other individuals who are otherwise affiliated or transacted with TGH, which includes safeguarding and protecting Plaintiff's and class members' Personal Information.

193.    TGH has a fiduciary duty to act for the benefit of Plaintiff and class members upon matters within the scope of their relationship. It breached that duty by failing to properly protect the integrity of the system containing Plaintiff's and class members' Personal Information, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard the Personal Information of Plaintiff and class members it collected.

194.    As a direct and proximate result of TGH's breaches of its fiduciary duties, Plaintiff and class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Personal Information; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Personal Information which remains in TGH's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Personal Information compromised as a result of the Data Breach; and (vii) actual or attempted fraud.

## COUNT IV
## UNJUST ENRICHMENT

195.    Plaintiff realleges and incorporates by reference paragraphs 1 through 171 above as if fully set forth herein.

196.    Plaintiff and class members conferred a benefit upon TGH in the form of monies paid for healthcare services or other services.

197.    TGH had knowledge of the benefits conferred upon it by Plaintiff and class members. TGH also accepted or retained the benefits from the receipt of Plaintiff's and class members' PHI.

198.    As a result of TGH's conduct, Plaintiff and class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

199.    The circumstances are such that it would be inequitable for TGH to retain the benefit conferred upon it without paying fair value for it; TGH should not be permitted to retain the money belonging to Plaintiff and class members because TGH failed to adequately implement the data privacy and security procedures for itself that Plaintiff and class members paid for and that were otherwise mandated by federal, state, and local laws. and industry standards.

200.    TGH should be compelled to provide for the benefit of Plaintiff and class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT V
## BREACH OF IMPLIED CONTRACT

201.    Plaintiff realleges and incorporates by reference paragraphs 1 through 171 above as though fully set forth herein.

202.    Defendant required Plaintiff and class members to provide, or authorize the transfer of, their Personal Information in order for TGH to provide services. In exchange, Defendant entered into implied contracts with Plaintiff and class members in which Defendant agreed to comply with its statutory and common law duties to protect Plaintiff's and class members' Personal Information and to timely notify them in the event of a data breach.

203.    Plaintiff and class members would not have provided their Personal Information to Defendant had they known that Defendant would not safeguard their Personal Information, as promised, or provide timely notice of a data breach.

204.    Plaintiff and class members fully performed their obligations under their implied contracts with Defendant.

205.    Defendant breached the implied contracts by failing to safeguard Plaintiff's and class members' Personal Information and by failing to provide them with timely and accurate notice of the Data Breach.

206.    The losses and damages Plaintiff and class members sustained (as described above) were the direct and proximate result of Defendant's breach of its implied contracts with Plaintiff and class members.

## <u>COUNT VI</u>
## DECLARATORY AND INJUNCTIVE RELIEF

207.    Plaintiff realleges and incorporates by reference paragraphs 1 through 171 above as if fully set forth herein.

208.    Defendant owes a duty of care to Plaintiff and class members that require it to adequately secure Plaintiff's and class members' Personal Information.

209.    Defendant still possesses the Personal Information of Plaintiff and the class members.

210.    Defendant has not satisfied its contractual obligations and legal duties to Plaintiff and the class members.

211.    Actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiff and class members. Further, Plaintiff and class members are at risk of additional or further harm due to the exposure of their Personal Information and Defendant's failure to address the security failings that led to such exposure.

212.    There is no reason to believe that Defendant's employee training and security measures are any more adequate now than they were before the breach to meet Defendant's contractual obligations and legal duties.

213.    Plaintiff therefore, seeks a declaration (1) that Defendant's existing data security measures do not comply with its contractual obligations and duties of care to provide adequate data security, and (2) that to comply with its contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to, the following:

     a.  Ordering that Defendant engage internal security personnel to conduct testing, including audits on Defendant's systems, on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

     b.  Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

     c.  Ordering that Defendant audit, test, and train its security personnel and employees regarding any new or modified data security policies and procedures;

d.  Ordering that Defendant purge, delete, and destroy, in a reasonably secure manner, any Personal Information not necessary for its provision of services;

e.  Ordering that Defendant conduct regular database scanning and security checks; and

f.  Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive personal information, including but not limited to, patient personally identifiable information and patient protected health information.

## COUNT VII
### VIOLATIONS OF THE FLORIDA UNFAIR AND DECPTIVE TRADE PRACTICES ACT, Fla. Stat. §§ 501.201, *et seq.*

214.   Plaintiff realleges and incorporates by reference paragraphs 1 through 171 above as if fully set forth herein.

215.   This claim is brought on behalf of Plaintiff and the Florida state class.

216.   Plaintiff and Florida class members purchased goods and services in "trade" and "commerce" primarily for personal, family, and/or household purposes.

217.   TGH engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of Fla. Stat. § 501.204(1), including:

a.  failure to maintain adequate computer systems and data security practices to safeguard Personal Information;

b.  failure to disclose that its computer systems and data security practices were inadequate to safeguard Personal Information from theft;

c.  failure to timely and accurately disclose the Data Breach to Plaintiff and Class members;

d.  continued acceptance and storage of Personal Information after Defendant

52

knew or should have known of the security vulnerabilities of its systems that were exploited in the Data Breach; and

e.   continued acceptance and storage of Personal Information after Defendant knew or should have known of the Data Breach and before it allegedly remediated the Data Breach.

218.   TGH's unfair or deceptive acts and practices include:

a.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and class members' Personal Information, which was a direct and proximate cause of the Data Breach;

b.   Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and class members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and HIPAA;

d.   Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and class members' Personal Information, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and class members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and HIPAA;

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and class members' Personal Information; and

g.   Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and class members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and HIPAA.

219.   Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of its data security and ability to protect the confidentiality of consumers' Personal Information.

220.   Defendant intended to mislead Plaintiff and class members and induce them to rely on their misrepresentations and omissions.

221.   Had Defendant disclosed to Plaintiff and class members that TGH's data systems were not secure and, thus, vulnerable to attack, they would not have used TGH's services and agreed to provide TGH with their Personal Information and Defendant would have been unable to continue in business. Instead, Defendant received, maintained, and compiled Plaintiff's and Florida class members' Personal Information as part of the services they provided without advising Plaintiff and Florida class members that TGH's data security practices were insufficient to maintain the safety and confidentiality of their Personal Information. Accordingly, Plaintiff and Florida class members acted reasonably in relying on TGH's misrepresentations and omissions, the truth of which they could not have discovered.

222.   Defendant acted intentionally, knowingly, and maliciously to violate Florida Unfair Trade Practices Act, and recklessly disregarded Plaintiff and class members' rights.

223.    As a direct and proximate result of TGH's unfair methods of competition and unfair or deceptive acts or practices and Plaintiff's and Florida class members' reliance on them, Plaintiff and Florida class members have suffered and will continue to suffer injury and actual harm in the form of, *inter alia*: (a) the compromise, publication, theft, and/or unauthorized use of their PII and PHI; (b) out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft and fraud; (c) lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; (d) the continued risk to their PII and PHI, which remains in the possession of TGH and is subject to further breaches so long as TGH fail to undertake appropriate measures to protect PII and PHI in its possession; and (e) current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Florida class members.

224.    Plaintiff and Florida class members seek relief under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*, including, but not limited to, actual damages, injunctive relief, and attorney fees and costs, and any other just and proper relief..

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the class, respectfully request that the Court enter judgment in his favor and against TGH as follows:

A.    Certifying the class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B.      Awarding Plaintiff and the class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.      Awarding Plaintiff and the class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the class, seeks appropriate injunctive relief designed to prevent TGH from experiencing another data breach by adopting and implementing best data security practices to safeguard Personal Information and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.      Awarding Plaintiff and the class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiff and the class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiff and the class such other favorable relief as allowable under law.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: July 27, 2023                          Respectfully submitted,

                                         */s/ Jeff Ostrow*
                                         Jeff Ostrow (FBN 121452)
                                         Kristen Lake Cardoso (FBN 44401)
                                         Steven Sukert (FBN 1022912)
                                         **KOPELWITZ OSTROW**
                                         **FERGUSON WEISELBERG GILBERT**
                                         One West Las Olas Blvd., Suite 500
                                         Fort Lauderdale, Florida 33301
                                         Tel: (954) 525-4100
                                         ostrow@kolawyers.com
                                         cardoso@kolawyers.com
                                         sukert@kolawyers.com

Tina Wolfson
(*pro hac vice* forthcoming)
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
twolfson@ahdootwolfson.com

Andrew W. Ferich
(*pro hac vice* forthcoming)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
aferich@ahdootwolfson.com

Mark B. DeSanto (FBN 107688)
**BERGER MONTAGUE**
1818 Market Street
Suite 3600
Philadelphia, PA 09103
Telephone: (215) 875-3000
mdesanto@bm.net